# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| One Real Estate LLC, dba The ONE Street Company, *on behalf of itself and all others similarly situated*,<br><br>        Plaintiff,<br><br>    vs.<br><br>CoStar Group, Inc., and CoStar Realty Information, Inc.,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>*Jury Trial Demanded* |

**COMPLAINT**

Plaintiff, One Real Estate LLC, dba The ONE Street Company ("ONE Street" or "Plaintiff") brings this antitrust action against CoStar Group, Inc., and CoStar Realty Information, Inc. (together, "CoStar" or "Defendants") under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, on behalf of itself and a proposed class of similarly situated purchasers (collectively, "Direct Purchasers"), and alleges as follows:

## I.    NATURE OF THE CASE

1.    This case is about CoStar's multipronged anticompetitive scheme to maintain its monopolies in the markets for commercial real estate ("CRE") Listing Services and CRE Information Services (as defined below).

2.    CRE Listing Services and CRE Information Services cannot work without CRE information, such as property descriptions, photographs, and prices. That CRE information comes primarily from CoStar's customers, including CRE brokerages such as Plaintiff that generate those descriptions, take those photographs, and set those prices.

3.    CRE brokerages need to publish these images and information in order to market their properties. They do so through their own proprietary website. Because CRE brokerages have a fiduciary duty to market their clients' properties as broadly as possible, they must also use multi-broker listing and information services. And because CoStar has monopoly power in the relevant markets for those services, that means CRE brokerages have to use CoStar.

4.    CoStar also requires its customers to agree that they will not share that CRE information with any other CRE Listing Service or CRE Information Service. Although the agreements insist that they are "non-exclusive," in fact they are de facto exclusive.

5.    And there are strings attached. When a CRE brokerage uploads CRE information to CoStar's CRE Listing Service (LoopNet) or its CRE Information Service (like the company,

1

also called "CoStar"), CoStar claims that information as its own. Indeed, because CoStar runs many brokerage's websites through its internet hosting service, LoopLink, even images and information that brokers upload to their *own* websites end up in CoStar's walled garden.

6.     The CRE information that CoStar ingests into its platform is a crucial input that would be essential to making a competing CRE Listing Service or CRE Information Service viable. By cornering the supply of CRE information, CoStar is able to deny competitors those inputs. As a result, no competitor has ever been able to grow large enough to impose price discipline on CoStar.

7.     Every few years, a competitor emerges and attempts to knock CoStar off its throne. And every time that happens, CoStar responds in the same way: with an anticompetitive scheme that has the intent and effect of preserving CoStar's monopoly power in the markets for CRE Listing Services and CRE Information Services., and with it, CoStar's power to charge supracompetitive prices to Plaintiff and the Class.

8.     CoStar's scheme has three parts. First, as noted above, CoStar locks up all of the major CRE brokerages in de facto exclusive contracts. This has the effect of placing a critical mass of CRE information behind CoStar's moat, raising rivals' costs to such prohibitive levels that no competitor can gather enough inputs to make a product viable.

9.     Second, CoStar enforces that exclusivity by claiming its customers' intellectual property as its own. It places watermarks on photographs that its customers upload—either to their own websites, to LoopNet, or to CoStar—and then asserts its own copyright over those images. CoStar also modifies CRE information by altering key data points—such as parking ratios, lot sizes, or building construction dates—so it can track this inaccurate data if it ends up on a competing service. Thus, if a brokerage tries to share with a competing CRE Listing Service

or CRE Information Service property information *the brokerage generated* or images *the brokerage took*, CoStar can and does trace the information back to its own manipulation of the data and images, and sue the competitor for purportedly infringing *CoStar*'s copyrights.

10. For example, When CoStar brought copyright infringement claims against a recent competitor, Commercial Real Estate Exchange, Inc. ("CREXi"), the competitor fought back. It asserted antitrust counterclaims, alleging not only that it did not violate copyright law, but that CoStar violated the antitrust laws by suppressing competition. The Ninth Circuit Court of Appeals ruled that CREXi plausibly stated a claim for violation of the Sherman Act.

11. Third, CoStar deploys technological impediments that make it impossible for any competitor to access the data it needs. It blocks internet protocol ("IP") addresses that try to access data from CoStar or LoopNet, even if CoStar never had a valid claim to that data in the first place.

12. The same scheme the Ninth Circuit found actionable in the CREXi matter supports Plaintiff's claims here. CREXi asserted its counterclaims on its own behalf, as a competitor to CoStar. This case seeks to recover on behalf of purchasers of CoStar's services, to correct the overcharges to which CoStar has subjected them, and to remedy CoStar's frustration of improvements in choice, quality, and innovation.

## II.    JURISDICTION AND VENUE

13. Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

3

14. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

15. The Court has personal jurisdiction over Defendants because they operate nationally and purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction.

16. The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against a corporation in any district where the corporation may be found or transacts business and allow all process in such cases to be served in any district where the corporation may be found.

17. Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District and caused harm to Class members in this District.

18. Further, Defendants have expressly consented to jurisdiction and venue in this Court. The applicable terms and conditions for CoStar provide that "CoStar irrevocably consents to the exclusive jurisdiction of the federal and state courts located in the District of Columbia for the purpose of any action brought against CoStar in connection with this Agreement or use of the Licensed Product." The applicable terms and conditions for LoopNet similarly provide that "LoopNet irrevocably consents to the exclusive jurisdiction of the federal and state courts located in the District of Columbia for the purpose of any action brought against LoopNet in connection with this Agreement or use of the Product."

19. Defendants' conduct alleged herein occurred within the flow of interstate

commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

20.    No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    PARTIES

### A.    Plaintiff

21.    Plaintiff One STREET is a corporation organized under the laws of the District of Columbia with its principal place of business in Bethesda, Maryland. Plaintiff purchased CRE Listing Services and Information Services from CoStar during the Class Period.

### B.    Defendants

22.    Defendant CoStar Group, Inc. ("CoStar Group") is a corporation organized under the laws of Delaware with its principal place of business in Arlington, Virginia.

23.    Defendant CoStar Realty Information, Inc. ("CoStar Realty") is a corporation organized under the laws of Delaware with its principal place of business in Arlington, Virginia. CoStar Realty is the primary operating entity of CoStar Group. As detailed below, CoStar acquired LoopNet, effective August 29, 2012. On January 1, 2017, LoopNet merged into CoStar Realty, and CoStar Realty is therefore the successor in interest to LoopNet's liabilities.

### C.    Key Personnel

24.    CoStar's actions are part of, and in furtherance of, the illegal monopolization alleged herein, and were authorized, ordered, or done by CoStar's current and former officers, directors, agents, employees, or representatives while actively engaged in the management of CoStar's affairs.

25.    Andy Florance is CoStar's founder and chief executive officer. In 1986, in his college dorm room, Florance founded the Realty Information Group, Inc., which eventually

5

became CoStar.

26.     Scott Wheeler was CoStar's Chief Financial Officer from 2016 to 2024.

27.     Christian Lown has been CoStar's Chief Financial Officer since 2024.

28.     Frank Simuro has been CoStar's Chief Technology Officer since 2015 and before that was their Chief Information Officer.

29.     Gene Boxer has been CoStar's General Counsel since 2022.

30.     On information and belief, the individuals above and other current and former CoStar officers, directors, agents, employees or representatives have developed and executed the anticompetitive scheme detailed herein, including by entering into exclusive agreements, in order to maintain CoStar's monopolies, raise barriers to entry, foreclose competition, and maintain prices for CoStar's CRE Listing Services and CRE Information Services at supracompetitive levels.

## IV.    FACTS

### A.    CoStar Provides Internet CRE Listing Services and CRE Information Services

#### 1.  CoStar

31.     CoStar was founded in 1987 by Andrew Florance and was one of the first online providers of property data relating to CRE. Through a series of acquisitions and exclusive partnerships, CoStar embarked on an aggressive growth campaign throughout the 1990s and quickly became the leading provider of online CRE information.

32.     After going public in 1998, CoStar continued to aggressively grow and expand. It is now the dominant player in the CRE information and listings landscape. CoStar has acquired more than 25 businesses within the last 30 years and is rarely threatened by a serious competitor.

33.     Every time a potential competitor has arisen, CoStar has squelched the nascent

competition either by acquiring the other company or by suing it. Since the 1990s, CoStar has filed numerous copyright-related lawsuits against individuals, its own customers, and competitors large and small.

34.    CoStar's customers have lamented these tactics. For example, a CRE broker told the widely read CRE publication *Bisnow* that "CoStar is the only organization that I deal with that is widely hated by its customers. You don't talk to them. They will sell your data to you, and every time they acquire a competitor, they raise their prices."

35.    Other analysts and industry commentators have noted that commercial real estate brokers have no meaningful alternative to CoStar and are forced to pay CoStar's high subscription rates, referring to the necessity of paying a "CoStar Tax" to access CoStar's platform to remain credible to clients and competitive with other brokers.

### 2.  CRE Listing Services

36.    Buyers, sellers, lessors, and lessees of CRE rely heavily on online platforms to conduct market research and locate suitable properties. These platforms, such as the ones offered by Defendants, include two related, but distinct, services: (i) listing services and (ii) information services. As explained in detail below, these are complementary products and both are often utilized by market participants when contemplating and completing real estate transactions.

37.    An internet CRE Listing Service is an online platform that presents information about CRE properties available for sale or lease. CRE Listing Services serve as a marketplace and feature listings created by brokers and other agents that subscribe to the platform. The listing services provide crucial information such as property address, size, photographs, and contact details for owner(s) or their listing agent(s).

38.    CRE Listing Services allow their users to both publish and search for listings

advertising CRE available for sale or lease on a structured, centralized online platform. In short, CRE Listing Services serve as an online marketplace that facilitates commercial real estate transactions by publicizing listings and offering crucial information to both sides of a potential CRE transaction.

39.     CoStar's CRE listing platform is known as LoopNet. LoopNet is the dominant provider of CRE listing services in the United States, capturing approximately 90% of the market for online CRE listing traffic in the United States.

40.     As CoStar described its LoopNet product in its complaint against its competitor Xceligent (discussed further below), "when a business needs to search for a new office or location for itself, it can browse available commercial real estate vacancies across multiple brokerages in a given market and customize search results using over 150 different criteria" on one platform. Unlike some other services, LoopNet offers both a free and paid subscription tier: "LoopNet supports the greater commercial real estate ecosystem by allowing non-registered users to view some listings for free. Users that wish to list properties or gain more robust searching capabilities must purchase a subscription. If a listing party subscribes to both LoopNet and the CoStar subscription database, it may use CoStar-copyrighted photographs, under license, in connection with its LoopNet listings." This language is an example of one of many instances in which CoStar gives the misleading impression that a significant proportion of the photographs on CoStar are taken by CoStar's own photographers, rather than images uploaded by CoStar's users.

41.     CoStar offers a related service called "LoopLink," which allows a CRE broker to display its property listings on its own website as those listings appear on LoopNet. As CoStar CEO Florance described LoopLink in a 2008 declaration, "[s]ome brokers pay LoopNet to

8

provide internet hosting and software tools to help the brokers display and market the brokers [sic] listings that they authored on the brokers [sic] own website . . . [LoopLink] enables the broker to allow visitors to search the broker's own listings by visiting the broker's own website." LoopLink and LoopNet are synced: when a broker adds a listing or updates an existing listing on LoopNet, the same update appears on the broker's own site via LoopLink, and vice versa. Due to the size and ubiquity of the LoopNet platform, many brokers rely solely on LoopLink/LoopNet to house their listings data, photographs, and other information.

42.    The CoStar information services platform includes several different groups of customers. As CoStar CEO Florance described his customer base in a 2008 declaration, "approximately 65,000 commercial real estate brokers in the United States . . . rely on CoStar's services to search for and find commercial real estate that is available for lease and for sale. Federal and state governments . . . rely on CoStar's services both to local commercial real estate available for lease or sale and to analyze and respond to economic conditions." Regardless of the purpose for which they use the product, all of these customers pay inflated prices.

### 3. CRE Information Services

43.    CRE Information Services are online data and analytics tools and publications used by CRE professionals and others to locate, research, and evaluate CRE sales and leases. The information provided includes property addresses, prices at which a given property has been offered for sale or lease in the past, prices at which comparable properties have been offered, leased, or sold in the past, lease histories, owner and tenant histories, detailed floor plans, photographs, and vacancy rates, among other things. CRE Information Services compiles this data and makes it accessible in a centralized, searchable way. As distinct from LoopNet, the CoStar information services product also includes properties *not* currently for sale.

9

44.     CRE professionals routinely utilize both information and listing services. CRE Information Services allow brokers and others to conduct market research and analyze properties in an efficient manner, while CRE Listing Services provide a centralized online marketplace to search property listings. In conjunction, these services streamline CRE transactions for all involved parties.

45.     CoStar is the dominant provider of CRE Information Services. CoStar's information services platform (also called CoStar) controls approximately 90% of the CRE Information Services market.

**B.     CoStar's Litigation Against LoopNet**

46.     In the past 15 years, CoStar has grown dramatically through a series of significant acquisitions.

47.     In 2014, CoStar acquired Apartments.com for $585 million.

48.     In 2015, CoStar purchased Apartment Finder for $170 million.

49.     In 2021, CoStar acquired Homes.com for $156 million.

50.     In 2020, CoStar acquired Ten-X for $190 million. Ten-X is CoStar's auction services platform.

51.     In 2025, CoStar acquired Matterport, a company specializing in creating three-dimensional renderings of properties, for $1.6 billion.

52.     But perhaps CoStar's most significant acquisition, for purposes of this litigation, is its 2012 acquisition of LoopNet.

53.     For over a decade at the turn of the 21st century, CoStar and LoopNet were in near constant litigation.

54.     In 1999, CoStar filed suit against LoopNet for copyright infringement, among other things. CoStar alleged that real estate brokers had infringed CoStar's intellectual property

10

by posting CoStar photographs to LoopNet's website.

55.     In 2003, the parties settled.

56.     In March 2005, LoopNet sued CoStar in federal court in California, accusing CoStar of breach of contract and unfair competition, among other things. LoopNet alleged that CoStar falsely claimed that "information contained within its database is obtained by CoStar's 'researchers, analysts and photographers' who 'canvass the country and retrieve the information you need.'" In fact, according to LoopNet, "CoStar actually accesses LoopNet's proprietary listings database and member directory in order to unlawfully obtain LoopNet's listings and member information, to copy and misappropriate the information contained within, and to contact LoopNet's members in an effort to convince those persons to use CoStar's competing service in place of LoopNet's."

57.     CoStar fired back, accusing accused LoopNet of copyright violations via unauthorized use of CoStar photographs. CoStar also alleged that LoopNet had improperly blocked CoStar IP addresses in order to deny CoStar access to LoopNet.

58.     CoStar CEO Florance made several efforts to resolve the dispute through direct discussions with LoopNet CEO Richard Boyle. According to a declaration Florance made in a case against a different competitor several years later, the two discussed the issue in a July 2005 telephone conference:

> [Florance and Boyle] discussed a number of things, including the issue of blocking each other's IP addresses from accessing our websites. IP blocking would mean that no one with a CoStar IP address could visit LoopNet's website at all. However, I noted that CoStar would still be visiting websites using LoopNet's LoopLink technology to obtain information to update CoStar's database, and thus total IP blocking would not work, as it could block CoStar's access to those broker websites . . . Mr. Boyle acknowledged and assured me that he understood that CoStar collected data from broker websites, including websites using LoopLink technology,

and further acknowledged that CoStar needed to be able to access brokers' own websites. Mr. Boyle assured me that any settlement would include LoopNet's agreement not to restrict or otherwise interfere with CoStar's ability to obtain listing data from brokers' websites and that the agreement would need to expressly accommodate that fact. ***Indeed, it was obvious at the time that LoopNet was not making the claim that brokers could not allow CoStar to visit the broker's websites and collect and update listing information, as LoopNet's broker customers would be outraged at such a claim***.

59. On August 4, 2005, the CEOs met in person to try to resolve their disputes. According to CoStar CEO Florance, LoopNet CEO Boyle readily acknowledged that "CoStar's researchers had the right to update CoStar's database from LoopLink-using broker websites [and] that LoopNet knew that telling its customers that LoopNet could restrict its customers' ability to market their commercial listings would be outrageous and would present LoopNet with a marketing nightmare."

60. In other words, CoStar took the position that it would be "outrageous" for LoopNet to block competitors' access to data that originated with brokers, merely because they were using LoopLink to host their brokerage websites.

61. On September 6, 2005, CoStar and LoopNet signed a settlement agreement. Among other things, according to Florance, the agreement provided that "the parties could access the non-password protected areas of each others' websites, and that CoStar would continue to have the right to update brokers' listings via broker websites."

62. According to Florance:

> Both sides understood their agreement that they would not block or impair "access" to the non-password-protected areas, and that those areas could be "accessed" by each other, to include the right to make use of information that appeared in those publicly-available areas. Based on my personal participation in these negotiations and discussions, there is no doubt in my mind that as part of the agreement the parties understood and agreed that a party could make free use of any information contained in the non-password-protected

12

areas of the other party's website, and that access to those non-password-protected areas would not be blocked or impaired.

63.     One "nonexclusive example" of "making use of information from those areas" that was "expressly discussed and agreed to" was "taking information from LoopLink websites and broker-directed links to the LoopNet website." According to CoStar CEO Florance, however, that was just an example, because "there were no limits discussed by the parties, or included in the agreement, on the information that the parties could make use of from the non-password protected areas, which of course are areas open to every member of the public."

64.     In the wake of the 2005 settlement agreement with LoopNet, CoStar adopted a policy to put this approach in writing:

> CoStar's policy, created pursuant to the Agreement, empowered its employees to copy broker-created content so long as the employee accessed the content through "a broker's publicly-available website that is powered through the LoopLink$^{TM}$ service" or by "clicking on a hyperlink [to a LoopNet listing] that a broker sends via email," despite the fact that these access methods *were expressly prohibited by LoopNet's Terms of Use*. Yet LoopNet approved CoStar's draft without ever objecting that it permitted CoStar employees to use the LoopNet site in a manner that violated the LoopNet terms of use.

In other words, CoStar CEO Florance believed that LoopNet had permitted CoStar to copy content that CRE brokers uploaded to LoopNet, despite the fact that LoopNet's terms and conditions expressly prohibited such conduct.

65.     LoopNet disagreed.

66.     On November 15, 2007, LoopNet sued CoStar in superior court in Los Angeles, again accusing CoStar of breach of contract, among other things. LoopNet alleged that "[n]otwithstanding Defendants' agreement to abide by LoopNet's Terms of Use, Defendants have used and copied listing information contained on LoopNet's website for competitive purposes."

13

67.     LoopNet further alleged that "Defendants have misrepresented to CoStar's subscribers, to real estate brokers, and to others that CoStar and its researchers independently compiled data that in fact was copied without authorization from the LoopNet website. In fact, CoStar has even copied listings from the LoopNet servers that incorporate photographs taken by or on behalf of the listing broker, and then applied a CoStar watermark to such photographs, thereby implicitly representing that the photographs were taken by and/or are owned by CoStar."

68.     In 2009, CoStar and LoopNet settled.

69.     On February 5, 2008, CoStar sued LoopNet in federal court in the Southern District of New York, alleging that LoopNet engaged in false advertising in violation of the Lanham Act by publicizing inflated membership numbers.

70.     On June 24, 2008, LoopNet filed its answer and counterclaim, and leveled its own Lanham Act accusations against CoStar. LoopNet alleged that CoStar built a "knock-off listing product" in imitation of LoopNet, made false claims about the CoStar product's popularity, unfairly disparaged LoopNet, and violated LoopNet's trademarks by copying the name of LoopNet's "Showcase" product.

71.     In 2008 and 2009, CoStar CEO Florance submitted declarations in the California state court matter. In those declarations, he admitted that CoStar built its platform by copying materials from LoopNet, explaining that "CoStar has openly and notoriously accessed information on the non-password protected areas of LoopNet's website both before and since the 2005 Settlement Agreement was signed. Specifically, CoStar has accessed, among other things, LoopNet's press releases, earnings calls, product descriptions, pricing descriptions, marketing materials, and listings, and made use of that information for competitive purposes."

72.     Yet Florance insisted that LoopNet acquiesced in this conduct. It was only in

14

2009, supposedly, that CoStar's conduct began to be an issue: "it was not until February 2009 that CoStar began any coordinated effort to collect particular information from listings on the non-password-protected areas of the LoopNet website."

73.    According to Florance, LoopNet did not take it well. "On February 12, 2009, LoopNet began to block CoStar from accessing the non-password protected areas of the LoopNet website as well as broker websites that employed LoopLink technology." In other words, Florance claimed that it was **_LoopNet_** that went back on the parties' agreement, which purportedly permitted CoStar free reign over LoopNet's conduct—even to use for CoStar's own competitive purposes—as long as CoStar's employees remained in the free, non-password protected sections of LoopNet's website.

74.    Over the next few days, CoStar complained to LoopNet; LoopNet removed the block; reimplemented it; CoStar complained again; and LoopNet removed the block again. Frustrated, CoStar looked for ways to circumvent the block. According to Florance:

> To avoid LoopNet's unlawful self-help efforts to block access, CoStar decided to engage in its own self-help by using technological and other means to avoid LoopNet's denial of access. On February 18, CoStar used different Internet addresses to access the non-password protected areas of LoopNet.com and broker websites, avoiding LoopNet's illegal blocking without necessitating the Court's intervention. From February 18 through February 27, CoStar's countermeasures worked to allow CoStar the access to LoopNet.com and the broker websites provided for in the 2005 Settlement Agreement.

75.    But LoopNet obstructed CoStar's countermeasures, too. "On Friday, February 27, LoopNet implemented a new, more comprehensive block on CoStar that terminated CoStar's ability to access the non-password protected areas of LoopNet.com and broker websites despite CoStar's use of countermeasures."

76.    In a fit of pique, CoStar CEO Florance described LoopNet's efforts to block

15

CoStar as an improper restriction on information that should be, according to CoStar, available to more than one listing service—namely, the content that brokerages themselves generate:

> ***LoopNet has been preventing CoStar's researchers from obtaining listing information provided to them by third party brokers*** from the non-password protected areas of LoopNet.com and from the broker's own websites. These brokers have typically given CoStar explicit permission to obtain such information, and, in fact, those brokers that are CoStar clients (which represent the vast majority of the top brokerage firms in the United States) explicitly give CoStar the permission to obtain listing information from their websites as a part of CoStar's standard licensing agreement. . . . Unless LoopNet has reversed its legal position, LoopNet acknowledges that those listings belong to the broker, not LoopNet. ***Yet LoopNet has been preventing those brokers from sharing them with CoStar, even though it professes no interest in the listings***.

77.    Florance further asserted that LoopNet's conduct was having an anticompetitive effect throughout the market:

> LoopNet's decision to break its promise to allow CoStar access to the non-password protected areas of LoopNet.com and broker websites is causing CoStar and the commercial real estate industry immediate and irreparable harm. Brokers who rely on CoStar to market their properties to CoStar's subscriber base of the top dealmakers in the commercial real estate industry are being hampered in their ability to transmit their own listings to CoStar. In addition, because a fair number of brokers direct CoStar researchers either to the non-password protected areas of LoopNet or to their own websites, ***LoopNet's block of CoStar is having a deleterious effect on CoStar's ability to conduct research and provide the commercial real estate marketplace with the highest quality, most up-to-date database possible*** . . . ***A commercial real estate broker who does not put his or her listings into CoStar could potentially be found liable for a breach of fiduciary duty and potentially can have their real estate license revoked***. LoopNet's casual denial of access to CoStar is thus an important and exigent issue for the commercial real estate community as a whole.

78.    Bizarrely, CoStar CEO Florance also contended that LoopNet had not only granted CoStar unbridled access to the *non*-password protected sections of LoopNet's website, but also granted CoStar access to the password-protected sections in order to allow CoStar to

police supposed abuses of its intellectual property:

> In addition, LoopNet's block extended to deny CoStar its limited right to access the password protected areas of LoopNet.com specifically protected by the 2005 Settlement Agreement  . . .  CoStar's access to the password-protected areas of LoopNet's website was specifically agreed upon to allow CoStar to monitor what CoStar contends has been the rampant infringement of CoStar's copyrights that has been occurring on the LoopNet website from its very inception. As LoopNet well knows, CoStar has identified over the years tens of thousands of CoStar photographs that even LoopNet acknowledges are appearing unlawfully on its website. When CoStar is blocked from its contractually guaranteed right to access the password protected areas to identify copyright infringements, CoStar is helpless to protect itself against the massive number of infringements that regularly occur on LoopNet's website. As such, CoStar's valuable intellectual property is degraded, and as photographs are reproduced and distributed across the Internet, CoStar's ability to control its copyrighted works is irreparably injured.

79. In short, the acquisition of photographs and listing data from brokers' LoopLink-powered websites—the conduct that, when committed by competitors CREXi and Xceligent, CoStar contended violates its copyrights—is precisely how CoStar itself acquired listing data. CoStar insisted that it must have access to content that brokers created and posted to LoopNet because anything else would be anticompetitive. But with no end in sight to its constant disputes with LoopNet, CoStar decided: *if you can't beat 'em, join 'em*.

80. Rather than overcome LoopNet's anticompetitive conduct, CoStar decided to absorb LoopNet and carry out the anticompetitive conduct itself.

### C.    CoStar Acquires LoopNet and the FTC Imposes Conditions

81. On April 27, 2011, CoStar announced it was acquiring LoopNet for $860 million.

82. On June 30, 2011, the FTC issued a second request pursuant to the Hart-Scot-Rodino Act Antitrust Improvements Act of 1976, demanding more information before it would approve the acquisition.

83.     On August 29, 2012, the FTC issued both its complaint challenging CoStar's acquisition of LoopNet and its decision and order (the "Consent Order") permitting it.

84.     In the Complaint, the FTC found that "CoStar and LoopNet today are the largest national providers of CRE listings databases and information services both in terms of comprehensiveness of coverage and of geographic scope. CoStar and LoopNet are the first and second choices for many U.S. CRE listings databases and information services customers, including CRE brokers, owners, and institutional investors."

85.     As a result, "[t]he effects of the acquisition, if consummated, may be to substantially lessen competition in the relevant markets by, among other things: (a) eliminating actual, direct, and substantial competition between CoStar and LoopNet and between CoStar and Xceligent; and (b) increasing the likelihood that CoStar will exercise market power unilaterally."

86.     The FTC found that the merger of the #1 and #2 providers of CRE listing and CRE information services would violate FTC Act § 5 and Clayton Act § 7.

87.     Exacerbating the anticompetitive effects of the merger was the fact that LoopNet also held a controlling stake in the #3 provider of CRE listing and CRE information services, Xceligent.

88.     The primary remedy in the consent order was the requirement that LoopNet divest its stake in Xceligent.

89.     In addition, the consent order contains a number of provisions requiring the combined CoStar and LoopNet entity to refrain from anticompetitive conduct–anticompetitive conduct that Defendants engage in today.

90.     **First**, the Consent Order provided that

> Respondents shall cease and desist from … implementing, … [any]
> written  condition  …  with  any  Customer  that:  1.  Directly  or

18

> indirectly prohibits or restricts a Customer from providing any CoStar Competitor … CRE Listings or CRE Information that relates to Represented Property or Nonrepresented Property, which CRE Listings or CRE Information was obtained or derived by the Customer from a source other than a CoStar Database … ; … prohibits a Customer from subscribing to any service provided by … a CoStar Competitor; … prohibits or otherwise restricts a Customer from purchasing a passive ownership or equity interest of up to twenty percent (20%) in a CoStar Competitor … ; and … prohibits a Customer from publicly endorsing or recommending … a CoStar Competitor.

91. In other words, the FTC barred CoStar from conditioning access to its platform on a promise that a customer would not also upload CRE Listings or CRE Information to a competitor. Effectively, the FTC barred CoStar from requiring its customers to agree to exclusivity.

92. **Second**, the Consent Order provided that

> Respondents shall: 1. Allow each Customer … for no or any cause, without payment or penalty of any kind, to terminate the Customer Contract … 2. Include in any Customer Contract . . . a right of termination … and 3. Not modify its usual and customary practices and policies relating to the terms or periodic renewal cycle of Customer Contracts … ([including via] (i) a significant increase in the number of Customer Contracts having terms longer than one (1) year; or, (ii) a significant increase in the number of Customer Contracts expiring in the same calendar quarter), in either case with the intent or effect of significantly reducing the number of Customers or other Persons for which a CoStar Competitor … can compete.

93. In other words, CoStar must not permit customers to end their contracts with CoStar and move to a competitor, and could not stagger renewals in a way that makes it impossible for a competitor to gain a critical mass of customers. This provision implicitly recognizes that customer contract terms and renewals operate as a barrier to competitor entry.

94. **Third**, the Consent Order provided that

> Respondents shall not suspend or terminate the provision of CRE Listings or CRE Information pursuant to a Customer Contract:

19

> 1. Without the Customer's consent; … Unless: a. … the Customer is violating … the Intellectual Property or use restrictions of the Customer Contract . . . .

95.    In other words, CoStar must not threaten customers with termination for no good reason.

96.    **Fourth**, the Consent Order provided that,

> Respondents shall allow … that, any Customer against whom Respondents have filed, or threatened to file, a judicial action alleging violation of Respondents' Intellectual Property rights or the use restrictions of a Customer Contract in any state or federal court may elect to resolve the Respondents' claims through arbitration.

97.    In other words, CoStar must not drag customers into costly litigation over alleged violations of CoStar's intellectual property with the sole purpose of forcing Customers to incur litigation costs.

98.    **Fifth**, the Consent Order provided that "Respondents shall not prohibit … Customers from using … web-based software … for managing market research … listings and comparables, commissions, customer relationships, project tracking, and transactions … to support, or in connection with, their purchase, lease, or license of CRE Listings or CRE Information from a CoStar Competitor."

99.    In other words, CoStar could not prohibit customers from using the services of competitors. As CoStar acknowledged in the complaint it would file against Xceligent four years later, "[t]he consent decree … limit[ed] CoStar's ability to exercise certain of its contractual rights against its own customers—particularly those seeking to enter into contracts with CoStar competitors like Xceligent."

100.    Sixth, the Consent Order provided that

> Respondents shall not discriminate against, penalize, or otherwise retaliate against a Customer because the Customer: … (ii) subscribes … to any database containing CRE Listings or CRE

20

> Information from a CoStar Competitor; (iii) purchases or considers purchasing a passive ownership or equity interest of twenty percent (20%) or less in a CoStar Competitor … (iv) publicly endorses or recommends … a CoStar competitor … or, (v) exercises the Customer's right to terminate. Examples of prohibited retaliation shall include … : 1. … termination … 2. … imposition of unfavorable contract terms … [or] 3. Respondents' (1) termination of a Customer Contract, or (2) refusal to renew a Customer Contract upon commercially reasonable terms.

101.  In other words, CoStar could not retaliate against customers who sent some of their business to competitors.

102.  CoStar executives signed the Consent Order and it became effective on August 29, 2012. By its terms, it expired ten years later, on August 29, 2022.

103.  The FTC Consent Order is a useful benchmark for conduct in the CRE Listing Services and CRE Information Services markets that may be anticompetitive. Since expiration of the Consent Order, CoStar has engaged in almost every act that the FTC expressly prohibited CoStar from undertaking precisely because such acts risked harm to competition.

## D.      CoStar's Litigation Against Xceligent

104.  On December 12, 2016, CoStar sued its competitor Xceligent for copyright infringement in federal district court in Missouri.

105.  At the time Xceligent operated (1) an information services product called CDX, which competed with CoStar's CRE database, and (2) a CRE listing platform, CommercialSearch, which competed with LoopNet.

106.  CoStar alleged that Xceligent engaged in widespread "piracy" by copying CoStar's images and content to support Xceligent's competing database.

107.  CoStar asserted four counts against Xceligent: copyright infringement, breach of contract, violation of the Computer Fraud and Abuse Act, and violation of the Digital Millenium Copyright Act.

21

108. The thrust of CoStar's complaint, as it had been in its cases against LoopNet, was that the bulk of Xceligent's content was generated by CoStar employees, which it then licenses to real estate brokerages. According to the complaint,

> CoStar licenses its copyrighted photographs and database content to commercial real estate brokerages for use on their own websites and in their own marketing material subject to various contractual restrictions that, among other things, preclude those brokerages from posting or providing CoStar photographs or other CoStar information on or to third-party websites. The brokerages remain free to provide their own photographs and information to such websites.

This gave the misleading impression that CoStar staff create the majority of content on CoStar, when in fact, CoStar's customers create the vast majority of content on CoStar, and CoStar then claims copyright over those materials. CoStar anticipated this: "Xceligent may try to point the finger at its customers, claiming that some of these copyrighted photographs were uploaded to CommercialSearch by, or at the direction of, individual brokers. But this cannot possibly account for all, or even a significant number, of the infringing images." In fact, customer-created images and information did and does make up a significant proportion of the information on CoStar and LoopNet.

109. As both sides had alleged in the LoopNet cases prior to CoStar's acquisition of LoopNet, CoStar alleged that Xceligent built its product by copying CoStar's content:

> Instead of focusing on developing broker lists, contacting those brokers to get relevant information about their properties, and taking original photographs of commercial real estate, Xceligent's 'research' apparatus consists, in significant part, of mass copying of CoStar's information and photographs market-by-market. Once a market is open, Xceligent can then sanitize the stolen content by contacting brokers to 'update' listings.

110. This tracks, almost verbatim, the allegation that LoopNet leveled against CoStar before the two were corporate affiliates.

22

111.   CoStar then walked through multiple examples in which Xceligent supposedly captured an image from CoStar or LoopNet, cropped out the CoStar logo, and added the Xceligent logo instead.

112.   According to the complaint, CoStar sought to protect its intellectual property not only through "copyright registration and binding Terms of Service," but also through various other "technological steps."

113.   First, CoStar implemented a block on IP addresses, such that, "[i]f a single IP address views an excessive number of listings on the LoopNet website, consistent with access by a competitor or other user that is systematically copying listings, that IP address is temporarily blocked from accessing LoopNet."

114.   Second, CoStar "salted the earth" by planting phony data in its listings. This was apparent in CoStar's accusation that Xceligent unlawfully acquired "data that cannot be derived by independent research," e.g., "where the CoStar databases contain a unique value distinct from the broker marketing materials and other sources."

115.   On June 28, 2017, Xceligent filed counterclaims against CoStar, accusing CoStar of monopolizing the markets for CRE Information Services and CRE Listing Services.

116.   Xceligent alleged that CoStar had deployed an anticompetitive scheme to monopolize those markets by denying Xceligent the inputs needed to establish a viable competitor. The components of this scheme included, inter alia, exclusive dealing that prevented CoStar customers from using Xceligent, and two mechanisms to enforce that exclusivity: "contaminating broker listings with artificial data known to be false" and "technological impediments," such as IP blocking, that had the intent and effect of obstructing Xceligent's access to the requisite inputs.

23

117.    In 2017, while Xceligent's counterclaims were pending, Xceligent filed for bankruptcy and ceased operations. As part of a later settlement agreement with CoStar, Xceligent released its counterclaims against CoStar. Thus, no court ever ruled on the merits of Xceligent's allegations.

118.    But CoStar continued with business as usual. And when CoStar tried the exact same playbook against another competitor, CREXi, the Ninth Circuit ruled that allegations very similar to Xceligent's stated a claim and survived a motion to dismiss.

**E.    CoStar's Litigation Against CREXi**

119.    Commercial Real Estate Exchange, Inc. ("CREXi") was founded in 2015 as a competitor to CoStar, offering both CRE Listing Services and CRE Information Services. CREXi touts a more technologically advanced, user-friendly interface compared to CoStar's, as well as increased transparency and access across various categories of real estate professionals and lower prices for the same services.

120.    It was not long before CREXi, like many potential competitors who came before it, was in CoStar's crosshairs. CoStar began contemplating litigation against CREXi as early as December 2019.

98.    In February 2020, CoStar leadership discussed CREXi's efforts to partner with other firms to stop using LoopNet, and memorialized the fact that CoStar did not want to allow CREXi to get a foothold in the information services and listings market. A CoStar executive also commented, "CREXI sucks. I want to destroy them," to which CoStar's CEO responded: "You go Joe. Fight like a son of a bitch who will never die."

99.    An April 2020 CoStar presentation demonstrates CoStar leadership considered CREXi a competitive threat. In this timeframe, a CoStar executive said to its CEO, "[y]ou

know I hate CREXI, and it triggers me." CoStar's CEO Florance responded, saying, "we will kick their asses."

103.    In September 2020, continuing its campaign of aggressive litigation against competitors, CoStar filed suit against CREXi. CoStar's primary allegations were that CREXi was infringing on the copyright of thousands of images from its listings database, using them without permission to, among other things, populate its own CRE Listing Service.

104.    CoStar sued CREXi for copyright infringement under the DMCA for removal of copyright management information and distribution of said material, misappropriation, breach of contract, and unfair competition under California law.

105.    CoStar asserted that it had identified more than ten thousand purportedly CoStar-copyrighted photographs on CREXi's platform, and claimed that CREXi's "attempt to clone CoStar's business [was] brazen—allegations echoing those in CoStar's earlier litigation against Xceligent, or for that matter, LoopNet's lawsuit against CREXi.

106.    CREXi defended the lawsuit by asserting, inter alia, that (i) CoStar alleged only a fraction of the 20 million images uploaded to CREXi since its founding were CoStar-copyrighted images and further, that of those allegedly CoStar-copyrighted images, most were never touched by CREXi and were uploaded directly by users; (ii) CoStar's watermark is not commonly understood in the industry or by CoStar executives as conveying copyright ownership because CoStar places its watermark on photos regardless of whether it actually owned them; and (iii) CoStar failed to send CREXi timely takedown notices, which would have allowed CREXi to investigate and cure copyright violations prior to CoStar commencing litigation.

107.    On June 23, 2021, CREXi asserted antitrust counterclaims against CoStar. CREXi alleged that CoStar perpetrated an "anticompetitive scheme to establish and entrench its monopolies over internet commercial real estate" listing and information services. CREXi alleged that CoStar's scheme has three prongs: (i) blocking CREXi's access to listings on broker websites that use LoopLink and on the LoopNet website, even where the broker directs CREXi to access listings from its website and/or LoopNet; (ii) conditioning access to CoStar websites and products on contractual terms that restrain brokers' ability to work with competitors and structuring those terms to sow doubt as to whether brokers even can work with competitors; and (iii) indiscriminately modifying and watermarking broker-owned photographs and then claiming copyright ownership over those photographs.

111.    The district court dismissed CREXi's antitrust counterclaims but the Ninth Circuit reversed, finding that CREXi plausibly alleged CoStar had monopoly power in the relevant CRE Information and Listing Services markets and that CoStar unlawfully maintained that monopoly power through its de facto exclusive agreements with its customers. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 150 F.4th 1056, 1075 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026). This litigation is ongoing.

### F.    CoStar's Litigation Against Zillow

121.    CoStar continues its legal campaign against potential competitors, including recently filing a lawsuit against Zillow Group, Inc. ("Zillow") in July 2025 for copyright infringement.

122.    CoStar's complaint against Zillow follows a similar playbook as its lawsuits against entities like CREXi and Xceligent, accusing Zillow of hosting nearly 47,000 of CoStar's copyrighted images and having grown its business by "free-riding" on CoStar's content.

123. Zillow has denied all claims and noted that CoStar's lawsuit reflects a broader pattern of CoStar "suing a competitor instead of competing on product quality and customer service." Its Motion to Dismiss CoStar's First Amended Complaint is currently pending in the United States District Court for the Western District of Washington.

**G.    CoStar's Litigation Against Customers**

124. CoStar has also sued its own customers, namely CRE brokerages that rely on CoStar for CRE information.

125. According to the Xceligent Counterclaim:

> CoStar also retaliates against industry participants that publicly support Xceligent, or merely consider doing so. For example, in 2016, CoStar without cause cancelled services provided to Bates Commercial, claiming that Bates Commercial violated a CoStar License Agreement. In CoStar's view, Bates was a "direct or indirect competitor of CoStar…." The only basis for the claim, however, was that Mr. Tray Bates, a prominent broker operating in South Texas, was serving on Xceligent's Board of Directors as the NAR's designated representative. CoStar's suspension of Bates Commercial's services was nothing more than retaliation against Mr. Bates for his association with Xceligent in order to discourage other prominent brokers and industry professionals from associating with Xceligent. The suspension was a direct violation of the bar under the FTC Order precluding retaliation against brokers who conduct business with any CoStar competitor, or otherwise interact with a CoStar competitor.

126. Xceligent also reported that CoStar discouraged a national brokerage from supporting Xceligent or sharing listings with Xceligent.

**H.    CoStar Deploys an Anticompetitive Scheme to Preserve its Monopolies**

127. For decades, CoStar has used the same anticompetitive scheme to create barriers to entry, obstruct competitors' access to necessary inputs, and frustrate competition. By denying competitors the inputs they would need to compete on the merits, CoStar has been able to maintain its monopolies and its ability to continue raising prices.

27

128.    CoStar has not succeeded as a result of superior product, business acumen, or historic accident. Instead, it has succeeded by frustrating competition in violation of the antitrust laws. CoStar's efforts to lock up customers in exclusive deals that deny inputs to competitors is not competition on the merits.

129.    CoStar learned the components of this scheme from LoopNet, when CoStar was the victim of the scheme. Unable to overcome the scheme, CoStar acquired LoopNet instead. It then used the very same scheme that it had itself decried when used against CoStar and deployed it against CoStar's competitors, including Xceligent and CREXi. The scheme has worked, enabling CoStar to preserve its monopoly power, forcing purchasers to pay supracompetitive prices and depriving them of the choice, quality and innovation that competition would introduce.

130.    In a 2008 declaration in one of the *LoopNet* litigations, CoStar CEO Florance took the position that "commercial real estate brokers owe a fiduciary duty to the property owners that contract with them to market their listings as widely as is appropriate under the circumstances (and in some states the law requires as much)." Similarly, in a 2009 declaration in the same case, Florance stated that "[a] commercial real estate broker who does not put his or her listings into CoStar could potentially be found liable for a breach of fiduciary duty and potentially can have their real estate license revoked. LoopNet's casual denial of access to CoStar is thus an important and exigent issue for the commercial real estate community as a whole." Florance made these statements in service of CoStar's position that, by obstructing CoStar from access to the inputs necessary to support a viable competing service, LoopNet was stopping CRE brokers from fulfilling their fiduciary duties. Yet today, CoStar deploys the exact same anticompetitive scheme it learned from LoopNet with the intent and effect of frustrating those fiduciary duties.

28

131.    The Scheme has several components, including (1) exclusive dealing that prevents CoStar customers from sharing CRE Information with any of CoStar's competitors; (2) contamination of broker listings with watermarks and false data that gives the misleading impression that the images and data originated with CoStar; and (3) technological impediments, such as IP blocking, that obstruct competitors' access to brokers' listing data.

### 1.    CoStar Enters into Anticompetitive Exclusionary Contracts That Entrench its Monopoly Power

132.    CoStar enhances and expands barriers to entry through exclusive dealing agreements. By denying competitors the sufficient scale and scope of data they would need to compete, CoStar ensures that it faces no price competition.

133.    Several key definitions are relevant here:

- "Licensed Product: The CoStar Product, together with any other product expressly included in the definition of 'Licensed Product' in the Agreement."

- "CoStar Product: Those portions of the Database [and] Information . . . that are licensed pursuant to this Agreement, including any updates or modifications thereto, and any information derived therefrom (including without limitation any information derived as a result of the verification of any portion thereof), the proprietary organization, layout, design and structures for categorizing, sorting, and displaying it, and the related tools and software."

- "Database: CoStar's proprietary database of real estate and/or lodging industry information."

- "Information: The information, text, forms, agreements, videos, photographic and other imagery, and data contained in or supplied from the Database."

134.    The license agreements that CoStar enters with its customers are governed by the CoStar License Agreement Terms and Conditions (the "CoStar T&C"), which are publicly available. The CoStar T&C, by its express terms, indicate that the licenses that customers grant

to CoStar are *non*-exclusive: "Licensee hereby grants to CoStar an irrevocable, non-exclusive license with respect to CoStar's and its affiliates' databases to use, modify, reproduce and sublicense with respect to commercial real estate information available on Licensee's website."

135.    Granted, CoStar pays lip service to brokerage customers' ownership of their intellectual property: "CoStar acknowledges that if Licensee provides CoStar with any information or imagery, Licensee retains its rights to such information and imagery, even following termination of this Agreement."

136.    But this promise is illusory. Once a customer provides its CRE information to CoStar, that information becomes part of the Licensed Product—which, as noted above and in at least one other provision, CoStar has the right to modify: "CoStar reserves the right to modify any part of the Licensed Product or the way the Licensed Product is accessed at any time, so long as such modifications do not significantly degrade the Licensed Product."

137.    In other words, in order to access CoStar's Information Services, a customer must give any CRE information on its website to CoStar. In effect, these terms seek to convert user-submitted images and information into CoStar property.

138.    And once a customer provides CRE information to CoStar, the customer is prohibited from sharing it with anyone else. The CoStar T&C provide an extensive list of "prohibited uses" of the CoStar Product, commanding that the "Licensee shall not":

- "distribute . . . make available, upload, . . . transmit, . . . transfer, provide access to, [or] sell, any portion of the Licensed Product by any means . . . to anyone other than Licensee . . . or modify, adapt or create derivative works of the Licensed Product; or store, copy or export any portion of the Licensed Product into any database or other software program."

- "use any portion of the Licensed Product, including any portion independently verified or confirmed by Licensee, to create, directly or indirectly, any database or product;" or

30

- "access or use the Licensed Product if Licensee is a direct or indirect competitor of, or provides any portion of the Licensed Product to any direct or indirect competitor of, CoStar or its affiliates."

139.    Of course, once a customer upload images and information, those images and information become part of the "Licensed Product." And if the customer uses LoopLink, it likely does not retain any copy of the images and information that is *not* on CoStar's servers. Thus, a customer that uploads images and information to CoStar is effectively bound in an exclusive agreement not to share those images and information with any other CRE Listing Service or CRE Information Service.

140.    In so doing, CoStar imposes on its customers precisely those restrictions that the FTC barred CoStar from implementing under the terms of the Consent Order.

141.    The exclusive agreement is of sufficient duration to be anticompetitive. While the CoStar T&C do not expressly indicate the term that applies to each license agreement, they do provide that any such agreement will auto-renew—unless the customer thinks to cancel at least 60 days in advance of the term ending—for a one year term. Courts routinely find that auto-renewals for a term of a year or more can contribute to the anticompetitive nature of an exclusive contract. What's more, these terms create a barrier to entry that makes it harder for competitors to acquire a critical mass of customers. CREXi alleged in its counterclaim that these provisions operate as a barrier to entry, because "CoStar locks users into contracts, auto-renews those contracts, and requires lengthy notice periods to prevent the auto-renewal." And as noted below, CoStar customers routinely complain about these practices on internet message boards.

142.    CoStar has boasted about the "moat" it has built up around its market position. As CoStar CEO Florance stated in a 2025 earnings call, "we believe we're creating value, digitizing it with leading marketplaces and information solutions that can result in a $1 trillion addressable market with a deep moat." In other words, CoStar's barriers to entry protect its monopoly.

31

143.     These terms have the intent and effect of making all of CoStar's customers exclusive to CoStar, building a moat around CoStar's valuable CRE information, denying rivals access to the inputs necessary to compete, and raising rivals' costs.

### 2.      CoStar Asserts Ownership Over Customer Provided Data

144.     CoStar's anticompetitive efforts do not end with the agreements it requires its users to sign. Once a user submits content to CoStar, CoStar manipulates that content to ensure exclusivity. CoStar places its own watermark on nearly every photo submitted to the platform, even if it does not actually own the photo. CoStar also routinely "fingerprints" listings on the platform, deliberately inserting false information into user-generated listings. The purpose of these activities is purportedly to protect CoStar's intellectual property. In reality, they discourage brokers from listing content on competing platforms and generates fear that if they do so, CoStar may restrict or suspend their access to CoStar's services. As described throughout the complaint, CoStar remains an essential component of many brokers' businesses and loss of access would cause substantial economic harm due to the lack of meaningful alternative with the same reach as CoStar.

### a)      *CoStar Places Watermarks on the Images on its Platform, Regardless of Ownership*

145.     CoStar routinely affixes its own watermark to photographs uploaded by brokers, including photographs over which CoStar holds no valid copyright interest, such as broker-owned or privately commissioned images.

146.     By watermarking broker-supplied photographs, CoStar falsely conveys ownership and control over that content and reinforces the de facto exclusivity imposed through its contractual arrangements. These watermarks enable CoStar to monitor whether brokers distribute listing content to competing platforms and to identify purported violations of CoStar's

exclusivity restrictions. CoStar does not adequately disclose these alterations to brokers. As a result, brokers are deterred from using or distributing their own photographs on rival platforms out of concern that CoStar will retaliate, namely by suing them.

147.    Documents produced in the CREXi litigation confirm the purpose and effect of CoStar's watermarking practices. In August 2020, a broker complained to CoStar that CoStar's watermarking of the broker's renderings caused the images to be blocked from appearing on competing websites. In response, a CoStar sales executive acknowledged that CoStar had added the watermark to prevent "further distribution" of the broker's photographs.

148.    CoStar's uncritical, widespread watermarking of images agnostic of ownership is not accidental. It is a deliberate effort to create doubt about ownership and restrict use beyond CoStar's platform. The underhandedness of this effort is illuminated by examples provided by CREXi in its antitrust counterclaims. During the course of the litigation, CREXi, at CoStar's behest, instituted an image filter to flag photos that CoStar purported to own. CREXi then sent the brokers who had submitted images flagged in this filter notice they would be removed from the CREXi platform because the photos were purportedly owned by CoStar. Numerous brokers responded that they own the photos and were confused and frustrated by CoStar's claims. Some of the sentiments expressed were as follows:

- "I would like to appeal this immediately. We paid for all of our pictures and they are the property of [my brokerage]. The only thing I can think of here is we also upload those listings/Pictures to LoopNet. By default CoStar adds our pictures to the CoStar records- however that does not make it the property of CoStar."

- "Again, if you would look at the pictures you would see my leasing sign in the pictures. I personally took every picture in CREXi as shown below . . . In fact it appears that CoStar has taken some of my pictures without MY permission."

33

- "Its [sic] funny how Co Star can steal all of my photos that I have uploaded to my listings there and keep them on their site even when I have removed the property."

- "These photos were taken by ownership years ago, not CoStar; it's insane that costar [sic] takes over the photos and claims them like that."

- "Well, that's a 'BS' claim by them! I've been marketing that building for 15-20 years, which is well before CoStar was even in the Madison market. They've used 'our' photos and then cropped out our watermark and then has [sic] the guts to claim those are their photos. Complete BS."

149.    Brokers have attempted to protect their ownership interests by adding their own watermarks to photographs before uploading them to LoopNet. CoStar has in some instances removed or cropped out broker watermarks and replaced them with CoStar's own watermark.

150.    Through these practices, CoStar creates and reinforces the false impression that broker-supplied photographs are proprietary to CoStar, even where brokers retain full ownership rights per its Terms of Use. The resulting uncertainty, combined with the threat of detection, enforcement, or retaliation, discourages brokers from sharing their own content with competing platforms and further entrenches CoStar's exclusionary control over the relevant markets.

### b)    CoStar Deliberately Modifies Listings to Include False Information

151.    CoStar also unilaterally alters brokers' listing information and property data in ways designed to facilitate monitoring and enforcement of its de facto exclusivity arrangements and to deter brokers from sharing content with competing platforms.

152.    CoStar's contractual terms purport to authorize CoStar to modify broker-supplied listing data. Consistent with those terms, CoStar has admitted in previous litigation that it inserts fictitious information, a practice it refers to as "seeding" a listing, into property records appearing on the CoStar platform. These intentional alterations include changes to property

characteristics such as parking ratios, lot sizes, and construction dates.

153.    CoStar uses detection software to identify the appearance of this altered data on competing platforms. When CoStar detects this information on a rival service, it treats the presence of that information as evidence of misappropriation or unauthorized use. These practices create fear among brokers that any information shared with competing platforms may be traced back to CoStar and used as the basis for contractual or legal enforcement actions.

154.    By covertly modifying broker-supplied data, CoStar effectively creates a trap for brokers seeking to reuse or distribute their own information outside CoStar's ecosystem. Brokers frequently retrieve listing information from CoStar for use in marketing materials or on competing services, believing the information reflects the data they originally submitted. As CoStar has secretly altered that information, brokers may unknowingly provide inaccurate or seeded data to competitors, after which CoStar uses its detection systems to accuse brokers or rival platforms of misconduct or contractual violations. The resulting fear, uncertainty, and risk of retaliation discourage brokers from using competing services.

155.    Of course, the "seeded" data that CoStar adds to its listings is false. Thus, in seeking to prevent competition, CoStar degrades its product—further showing how competition would introduce improvements in choice and quality.

           c)       *Technological Impediments to Prevent Competitors' Access to Listings Information*

156.    In addition to directly modifying customer-supplied content, CoStar also places technological barriers around its public-facing websites in an effort to prevent competitors from viewing the same, even when it prevents a broker from granting permission to a competitor to view the broker's own website, photos, and/or property listings.

157.    CoStar employs an "abuse monitor" to prevent what it deems to be unauthorized

35

access to its platforms. When an IP address is found to be engaging in certain activities, such as viewing a large number of listings in one session, CoStar temporarily blocks the IP address from further access to the site. CoStar also displays a copy of this notice, directing the user to CoStar's Terms of Use:



158.    CoStar's and LoopNet's Terms and Conditions specifically prohibit "access or use … if you are a direct or indirect competitor of … [CoStar] or its affiliates[.]"

159.    CoStar will also permanently block certain IP addresses from accessing its platforms. This IP block extends to brokers' own LoopLink-hosted websites and is done without informing the broker that CoStar will prevent certain users from accessing what the broker understood to be a website available to the public. This prevents competitors from accessing live listings on brokers' websites, even when the broker gives permission to do so. This IP blocking was raised in both CREXi and Xceligent's antitrust counterclaims. CREXi's counterclaims noted numerous instances of brokers' surprise at CREXi's inability to access the listings they believed were publicly available without restrictions.

160.    CoStar's efforts to block competitors' access to its platform are in stark contrast

36

to its previous position on such access. Prior to CoStar's acquisition of LoopNet, LoopNet sued

CoStar to block CoStar's access to its publicly available CRE listings. In previous litigation,

CoStar's CEO Andrew Florance explained that CoStar needs to access CRE listings and

information available on LoopNet in order to remain competitive:

> CoStar researchers obtain the most complete and up-to-date information about commercial real estate in a variety of ways...In some cases, our researchers find out about listings by asking the broker a series of questions about the property in question. In other cases, the broker themselves have already written up a description of the property. ***In the latter cases, commercial brokers often direct CoStar researchers to take their listings from the brokers' own websites or email their listings to CoStar***. Because brokers make money when their properties are sold or leased, they are naturally eager to obtain the maximum possible exposure for their listings. CoStar has long employed these techniques both for listings that have no connection to LoopNet and for listings representing brokers that, as discussed below, have paid LoopNet to host the listing portion of the broker's website.

(emphasis added). Now that CoStar owns LoopNet, however, it bars competitors from acquiring

images and information from brokers in exactly the way that CoStar once did.

161.    In a separate declaration, CoStar CEO Florance stated that LoopNet "has been

preventing CoStar's researchers from obtaining listing information provided to them by third

party brokers from the non-password protected areas of LoopNet.com and from the broker's own

websites," even though "[t]hese brokers have typically given CoStar explicit permission to

obtain such information." Florance also supplied that LoopNet "acknowledges that those listings

belong to the broker, not LoopNet. Yet LoopNet has been preventing those brokers from sharing

them with CoStar," going so far as to prevent CoStar from accessing the brokers' own websites.

In other words, CoStar's own CEO has acknowledged that restricting or blocking access to

online listings, even with consent from the broker that created the listings, is anticompetitive.

These efforts persist despite Florance and CoStar's previously acknowledging that

"[c]ommercial real estate brokers owe a fiduciary duty to the property owners that contract with them to market their listings as widely as is appropriate under the circumstances" are even required by law in some states to do so.

111. This conduct is especially pernicious because many brokers rely on CoStar as a centralized location to host all of their listings' photographs and data, rather than expending additional resources to maintain separate listing repositories. CREXi's counterclaims cite at least one example of a broker contemplating listing properties on CREXi and directing the company to access their LoopLink hosted listings websites, only for it to be blocked by CoStar. In one such example, a broker admitted it exclusively relied on CoStar to save their listings:

> Unfortunately our listings are on the [brokerage] website via Looplink. I do not keep lists of our listings on excel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get you [my brokerage]'s listings at this time.

162. Competing CRE listing services are harmed by the blocking technology that CoStar employs because the additional work to maintain and update CRE listings raises rivals' costs and, at a minimum, deters brokers from working with competing CRE listing services. CoStar's CEO has previously acknowledged the anticompetitive harm resulting from LoopNet's use of similar blocking techniques prior to CoStar's acquisition of the company, stating that it "makes it less likely that other prospective customers will enter into economic relationships with CoStar."

## V.    ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

163. CoStar's multipronged scheme to prevent competition in the market for CRE Listing Services and CRE Information Services is anticompetitive because it foreclosed competition, and resulted in antitrust injury to Plaintiff and the Class in the form of

38

overcharges—i.e., paying more than they would have absent CoStar's illegal conduct—and reduced choice, quality and innovation.

164.    Because barriers to entry and expansion in the relevant markets are substantial, competition on the merits is critical to preserving competition and protecting consumers. Absent injunctive relief to halt CoStar's anticompetitive conduct, CoStar will continue to subject Plaintiff and the Class to these antitrust injuries.

**A.    CoStar's Scheme is Anticompetitive Because It Substantially Foreclosed Competition**

165.    CoStar has pursued the anticompetitive Scheme with the intent and effect of denying competitors sufficient data to develop a viable CRE Listing Services or CRE Information Services database, and the Scheme has been successful.

166.    In order to be a viable competitor to CoStar, a rival provider of CRE Listing Services and CRE Information Services must secure enough data to create a database of sufficient scale. This plays out across two metrics. First, the service must have sufficient information and listings. Second, the service must be national in scope.

167.    CoStar's scheme has ensured that only its CRE Listing Service and CRE Information Service meet those criteria. As detailed below, government purchasers and private purchasers alike bemoan this state of affairs.

168.    Though nascent competitors have tried, none have been able to gain a foothold in the market for CRE Listing Services and CRE Information Services, displace CoStar from its dominant position at the top of the market, or grow enough to force CoStar to compete on price. CoStar acquired LoopNet; successfully chased Xceligent from the market; and tried to do the same to CREXi, which has persisted, but has not grown large enough to impose pricing discipline on CoStar.

39

169.    There is no reason why the customers that provide data to CoStar could not also provide their data to competitors. CRE information is not a finite resource. Indeed, CoStar has recognized that CRE brokers have a fiduciary duty to their customers to publish their listings as far and widely as possible. Yet CoStar's anticompetitive Scheme is designed to prevent CRE information from appearing anywhere but CoStar.

170.    While there may be some inputs that are not exclusive to CoStar, the data over which CoStar does have exclusive control is sufficient to deny its competitors the scale they would need to compete. CoStar's conduct has foreclosed competitors from access to far more than 40% of inputs necessary to make a competitor's CRE Listing Service or CRE Information Service viable.

171.    In sum, CoStar has foreclosed access to necessary inputs, raised rivals' costs, erected and preserved barriers to entry, excluded competitors, and maintained its monopolies.

**B.    CoStar's Scheme Caused Antitrust Injury in the Form of Supracompetitive Prices and Diminished Quality, Choice and Innovation**

172.    CoStar has caused and continues to cause antitrust injury to Plaintiff and the Class by charging supracompetitive prices, and by decreasing the variety and choice of services available to purchasers of CRE Listing Services and CRE Information Services.

**1.    CoStar Charges Supracompetitive Prices**

173.    CRE Listing Services and CRE Information Services is one of the largest sources of revenue for CoStar. In 2025, CoStar earned $1.259 billion from CoStar and $312 million for LoopNet, together accounting for roughly 49% of the company's overall revenue.

174.    CoStar sells its CRE Listing Services and CRE Information Services at gross margins exceeding 34 percent. Its revenues and profits continue to grow year after year, and it continues to raise prices, despite the (largely unsuccessful) efforts of other companies to loosen

CoStar's grip on the market.

175.    Every time CoStar eliminated a competitor—whether by acquisition, or by using its anticompetitive Scheme to deprive them of necessary inputs—it promptly increased prices on its customers to supracompetitive levels.

176.    Shortly after acquiring LoopNet (and eliminating it as a competitor), CoStar promptly raised prices. The CREXi Counterclaim cites one CoStar customer who reported a price increase of 300% to 500%.

177.    Similarly, just seven months after driving Xceligent into bankruptcy, CoStar raised the average monthly price it charged new customers from $255 to $466—an increase of more than 80%.

178.    CoStar's growth does not come from improving its product, expanding its footprint or adding new customers. It comes from gouging existing customers by increasing their prices, because they have nowhere else to turn. As CoStar CEO Florance stated in a recent earnings call, "Revenue growth year-over-year is pretty much all price-driven."

179.    Simply put, CoStar charges more for CRE Listing Services and CRE Information Services than it could charge if it had not undertaken an anticompetitive Scheme to exclude competitors from the market. It can charge more than a competitive price because there is no viable competitor in the marketplace that can impose price discipline on CoStar.

180.    The emergence of additional providers of CRE Listing Services and CRE Information Services could have spelled trouble for CoStar's dominance of that market. If the competitors were able to acquire and access enough CRE data to build databases of sufficient scale to support competitive products, their entry would have engendered competition among providers of CRE Listing Services and CRE Information Services that would have led to lower

prices and increased choice for Plaintiff and members of the Class. Instead, CoStar deployed its anticompetitive Scheme to foreclose competition and maintain its monopoly.

181. But for CoStar's conduct, one or more competitors would have subjected CoStar to meaningful competition, considerably reduced CoStar's share in the relevant market, and undermined its monopoly power—leading to lower prices for Plaintiff and the Class.

182. CoStar's charging supracompetitive prices to Plaintiff and the Class is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendants' anticompetitive Scheme. As such, CoStar has caused antitrust injury to the Class.

### 2. CoStar Denies Its Customers Full Access to the Relevant Markets

183. Another anticompetitive harm of CoStar's scheme is that it denies its customers, including CRE brokerages, access to the full range of CRE Listing Services and CRE Information Services.

184. Plaintiff and the Class are injured by the inability to post their CRE information on multiple CRE Listing Services and CRE Information Services. This undermines brokerages' ability to meet their fiduciary duty to their customers to maximize visibility of their listings.

185. For one thing, the data would be more accurate; CoStar admits that as part of its anticompetitive scheme, it deliberately misrepresents key data points about properties on its services.

186. Brokers, buyers, and competition would benefit if brokers were able to widely publicize their CRE listings on different platforms.

### 3. CoStar's Scheme Is Not Competition on the Merits

187. CoStar may contend that its dominant market share in the Relevant Markets is a function of purchaser demand—i.e., that customers simply prefer CoStar and LoopNet to the alternatives. But CoStar has not acquired and maintained its dominant market share through a

42

superior product, business acumen, or historic accident. Instead, it has deployed a Scheme that is anything but competition on the markets.

188.    In online message boards and review sites, purchasers routinely bemoan CoStar's monopoly control of the markets for CRE Listing Services and CRE Information Services, its inferior product quality, its oppressive contract policies (including auto-renewals), and its supracompetitive prices.

189.    Reviews on Yelp include:[1]

- **A total monopoly and you do NOT get what you pay for**. I used to have a contract with them (very expensive!).  … Looking at the 80+ 1 star reviews, it appears the public has spoken.

- This company is taking advantage of people & real estate companies all across the nation! … **It is outdated more times than not** and is not automated like a residential MLS... I find better data by literally Google searching a property address … **The modern day monopoly, CoStar, is a predatory corporation that takes advantage of its "customers". I quote "customers" because I was forced into using the service.** … Just remember that if one person signs up for the subscription, EVERYONE has to sign up for it.  We are a commercial brokerage company in Baltimore, MD and we pay more for CoStar than we do for our office rent.

- Once costar bought [LoopNet] they do these harassing phone calls every week … to gather information from you. And when you block them they call from a different number and different area code. When you ask them to stop they say they can't and keep calling. … They are not concerned with listening to their customers and perceive themselves as to [sic] big to fail. **I am looking for and giving my support to anyone who is their competition. Not to mention their rates are VERY high.**

- I've been a broker for 15 years, based out of Miami. I have been a costar [sic] subscriber for 3 years. … **They have a**

---

[1] All emphases added.

**monopoly with commercial real estate and something has to be done.**

- Very high fees (since it is a monopoly and **it auto-renews yearly contract without informing you** and then it is impossible to get out of the contract without waiting another year. Unethical.

- Recently, CoStar backed my company into a corner and made all brokers pay for this service although only 1 of our brokers uses it. … CoStar is a scam and I want nothing to do with it. I can't use it on multiple computers and **CoStar is notorious for being a service that nobody likes to use, but has to use because there is a monopoly. I hope that CoStar can one day be eliminated from the CRE market and a company emerges that actually has accurate information and doesn't back their customers into a corner to pay for a ridiculously high amount per month**.

- Don't even know why i [sic] signed up, loopnet [sic] was a better, but **since they bought out loopnet [sic] and monopolize the industry, there isn't much a consumer can do**. Tried cancelling and was only a few days from my renewal but will not release me of the contract. … Bottomline, there should be a class action suit against them and their business practices.

- Their "customer last" attitude would have killed their company already if they weren't so litigious against their competitors.

- **Costar loopnet [sic] are ripoff artists!** Keeps withdrawing money from your account even after canceling listing. … I had to cancel card and account to keep them out! Ripoff!

- **They deceptively lock people in contracts and refuse to cancel subscription**. Worst customer support.

190. Similar comments appear on the popular online message board Reddit, and corroborate the allegations above that CoStar improperly claims intellectual property rights over content uploaded by its customers:

- Throwing all in on Crexi ... **I'm so over the LoopNet/CoStar/TenX monopoly**.

44

- Wellllllllll Costar ACCUSES them of stealing, but they didn't. **I cannot count the amount of times I entered photos on both Crexi and Loopnet/Costar that I hired a photographer to take or I took myself (so I owned them either way) and then Costar accused Crexi of stealing them because they somehow claimed ownership just because they were on their site too**. Then I have to jump through hoops to prove that they are my photos that I can post. I hate Costar. They are stealing and then lying about it. I started putting my logo watermark on each photo so that Costar cannot use us to attack other companies and continue **their vicious monopoly on the commercial real estate listing & data platform**.

- First, let me state that I'm in CRE marketing and not affiliated with Crexi. I've been watching with interest as newcomer Crexi has been working toward gaining market share since 2018. **But over the last few years, LoopNet/CoStar/TenX has been less of a juggernaut and more of a monopoly in the CRE space, asking for ridiculous listing fees for minimal return on investment and customer service that feels more like hard-core sales**.

- **CoStar operates as a monopoly in the commercial real estate industry**, creating significant challenges for professionals and the general public. Before CoStar's acquisition, LoopNet provided free access to listings, but **after the merger, CoStar implemented high fees and restrictive policies, making it harder for smaller players to compete**.

- **I've seen them eat their competition numerous times**. They are willing to pay ridiculous amounts of money to keep their monopoly intact.

- **I would love to see a bit more competition in the field, Costar had a complete monopoly for ages** and they raked us over the coals with their pricing.

- I'm a broker. I use CoStar for listings, but that's really about it. **They have some predatory contracts that they lock you in**. You have to give them a 60 days cancellation notice at the end of the current agreement or else it automatically renews another 12 months whether you like it or not. And the customer service is trash.

191.    One theme that emerges from these comments is that the market is craving

45

competition. CoStar has blocked it.

192.    Similarly, statements from government purchasers confirm that CoStar operates as a monopoly and that, while purchasers might prefer alternatives, none are available.

193.    Government purchasers use CoStar for various purposes. Tax agencies use CoStar data to value commercial properties and determine whether the owners have additional tax liabilities. Economic development agencies may use CoStar data to support site selection, tax assessment, or economic analysis. City agencies that manage government-owned real estate assets may use LoopNet to market properties that the government no longer needs. And sheriff's offices or other law enforcement agencies may use CoStar's auction services to find purchasers for seized assets. Regardless of the purpose, all of these purchases are at supracompetitive prices that have been elevated as a result of CoStar's anticompetitive conduct.

194.    In the context of government procurement, statutes and regulations often require state and municipal agencies to award a bid to multiple bidders, if possible. Where the agency seeks to award the full contract to a single bidder, it is often required to memorialize the justification for granting the bid on a "sole source" basis. Government agencies routinely seek sole source approval for CoStar, contending that only CoStar has the requisite data. To the extent that is true, it is a result of the anticompetitive scheme detailed herein.

195.    In 2022 Placer County, CA sought approval to award a contract solely to CoStar because "[t]he software platform provided by CoStar is proprietary and can only be obtained from CoStar as they do not authorize others to sell their services."

196.    In 2024, USDA Lease Acquisition and Administration Branch ("LAAB") sought a Sole Source Justification to award a contract to CoStar because "LAAB has been unable to find any other products that provides the entire scope of information needed." The request recognized

that CoStar's acquisitions had eliminated competition that previously existed, explaining that it had no choice but to pay CoStar's exorbitant prices because "CoStar has purchased other companies that provided free services (e.g. LoopNet)."

197.    In 2025, the Internal Revenue Service filed a "Justification & Approval For Far Subpart 13.5 Sole Source (Including Brand Name) Acquisitions," seeking approval to appoint a sole source contract to CoStar. The IRS argued that "there is only one source, CoStar, who is able to provide the requirement in accordance with the statement of work," and noted that CoStar "has historically proven to be the only database of its kind." The sole source request acknowledged that CoStar is the only such database because of its exclusive access to data from CRE brokers and owners: "critical proprietary information is obtained and provided through direct contact with parties familiar with the sales transaction namely, property buyers, sellers, and brokers." In other words, CoStar's de facto exclusive agreements lock up the critical inputs for CRE Listing Services and CRE Information Services, such that no competitor can marshal a viable competing product.

198.    In 2025, the city of Glendale, AZ filed a Procurement Sole Source and Special Procurement Request to award a contract to CoStar alone, because "CoStar is the only comprehensive commercial, office, land, and industrial real estate database" recognizing that "CoStar's database information is proprietary." The Glendale request explained that while it sought out alternatives, none were available since CoStar chased Xceligent out of the market: "[t]heir previous competitor Xceligent filed bankruptcy and no longer provides this service. Staff continues to seek other resources should a new provider become available."

199.    In 2025, the National Park Service filed a Justification & Approval For Other Than Full and Open Competition, requesting permission to award a contract solely to CoStar.

47

The Form noted that while NPS considered services such as REIS by Moody's Analytics, CompStak Exchange, and the Multiple Listing Service ("MLS"), only CoStar offered the CRE information it needed.

200.    In 2025, Chicago's Department of Planning and Development sought sole source approval because "[w]ithout access to CoStar, DPD has no alternative resource to provide the range of real estate industry information in a comprehensive and cost effective manner. The types of research staff conducts is not readily available and DPD can find no similar alternative to CoStar."

201.    Earlier this year, Florida's Department of Revenue sought approval for "Single Source procurement due to proprietary nature of information available only on the CoStar online database and licenses to this online database are only available through CoStar."

202.    In short, private purchasers and government purchasers alike are forced to purchase CRS Listing Services and CRS Information Services from CoStar because the anticompetitive scheme described herein has eliminated any viable alternative.

203.    Competitors, if they were permitted to compete, would offer improvements in price, quality, choice and innovation.

C.    **No Procompetitive Benefit Justifies CoStar's Anticompetitive Conduct**

204.    CoStar claims that the success of its business is due to the scale of its database, which is continually growing because of its exclusive deals. CoStar claims that the breadth of the CoStar and LoopNet databases makes them unique and a more valuable resource for customers.

205.    These are not procompetitive effects from competition on the merits. CoStar's market power does not stem from CoStar's creative ability to design a superior product, but rather from the Scheme detailed above. CoStar has not made its product *better*, but rather worked to hamper competition.

206. Even if there were any procompetitive effects arising from CoStar's conduct (there are not), the anticompetitive effects of CoStar's conduct outweigh any such benefits. And even if any such procompetitive effects exist, they could easily be achieved via less restrictive means: namely, obtaining the same data on a non-exclusive basis.

## VI.   RELEVANT MARKET AND MONOPOLY POWER

207. To the extent Plaintiff's claims require the definition of a relevant product market, the relevant product markets in which CoStar competes, and has monopoly power, are the markets for CRE Listing Services and CRE Information Services.

208. At all relevant times, CoStar has possessed, and continues to possess, monopoly power in the markets for CRE Information Services and CRE Listing Services in the United States. Each of these services is a distinct product with no reasonable substitutes and thus each constitutes its own relevant product market.

### A.   The Relevant Product Markets are the Market for CRE Listing Services and CRE Information Services

#### 1.   CRE Listing Services

209. CRE Listing Services operate as online marketplaces where users may both publish and search listings of CRE available for sale or lease. These listings typically include addresses, sale or lease price, photographs, details about previous/current tenants, among much other information and provide a centralized location for buyers, sellers, and their agents to post or search for available CRE property. The information available on Listing Services is largely provided by property owners or their agents, such as CRE brokers.

210. Internet CRE Listing Services offer a straightforward, "one stop shopping" experience for CRE brokers, buyers, sellers, and other market participants. Employing an online listings platform lowers search costs and their use is indispensable to commercial real estate

49

professionals.

211.    There are no reasonable substitutes for a CRE Listing Service. Potential alternatives, such as CRE listings published in newspapers or other physical media, or even searches across databases that are not specific to CRE, such as Google or Facebook, are neither functional nor economic substitutes.  Manual listing and information services take more time, effort, and cost than CRE Listing Services and CRE Information Services, which are nearly instantaneous and have a variable marginal cost close to zero.

212.    On information and belief, expert discovery will show that CRE Listing Services exhibit low cross-price elasticity of demand with respect to other methods of obtaining CRE information. Further, the demand for CRE Listing Services is relatively inelastic. At any given moment in time, there is a universe of individuals who are seeking to buy, sell, lease CRE. Changes in the price for CRE Listing Services will not change the quantity of such services demanded by the market. The relative inelasticity of demand, combined with the lack of competition, enables CoStar to charge supracompetitive prices without fear of losing volume.

213.    There are high barriers to entry in the markets for CRE Listing Services, due in part to the substantial upfront capital investment required. In order to launch a CRE listings platform, one must potentially spend millions of dollars designing, developing, and testing the software platform. And then, once the platform is built, substantial time and resources must then be expended in marketing and recruiting users to the platform. CoStar has raised those barriers by locking a potential competitor's userbase into long term, exclusionary contracts that are difficult to cancel and prevent the competitor from accessing a broker's listings, data, and participation on its platform. Additionally, and further described below, CRE listing services are subject to substantial network effects, which makes the service unable to compete unless the

50

competing entity is able to rapidly build its user base and accessing the listings that comes along with it.

214.    In theory, a commercial property or CRE broker could forgo the use of an online marketplace. In practice, these additional options are rarely used because they are much less efficient, more expensive (in terms of time and money), and are less effective than advertising as part of an Internet CRE Listing Service. With the advent and availability of these listing services, buyers, sellers, and other real estate professionals are not conducting one-off searches on search engines such as Google and Facebook Marketplace to locate properties. No alternative service combines the size of the audience, volume of listings, and ease of searching said listings that Internet CRE Listing Services provide.

215.    As a result, these alternative services and modes of searching for property are not reasonable substitutes for Internet CRE Listing Services. If a hypothetical monopolist were to execute a small but significant and non-transitory increase in price ("SSNIP") for its CRE Listing Service, such as increasing prices by five percent above a competitive level, current customers would not substitute away from this product in significant numbers. Accordingly, CRE Listing Services are a relevant product market.

## 2.    CRE Information Services

216.    CRE Information Services refers to the market reports and analytical tools that CRE brokers and other market participants use to locate, research, evaluate, and optimize the sale or lease of commercial real estate. These services encompass a broad range of informational inputs, including but not limited to: property addresses, historical asking and transaction prices, comparable sale and lease data, lease and property histories, property descriptions, detailed floor plans, photographs, tenant information, and vacancy rates.

217.    A substantial portion of commercial real estate brokers and other professionals

51

subscribe to CRE Information Services. These services provide online access to large volumes of data that allow for easy holistic analysis of the target real estate market and/or transaction.

218.  Furthermore, a significant amount of the information available on these CRE Information Services is derived from broker-provided listings. A strong position in the listings market directly reinforces the ability to compete in the information services market. The economic significance of this market is reflected in CoStar's financial performance: information and analytics operations account for approximately 45% of the company's total annual revenue of $1.5 billion.

219.  Although certain CRE data can be obtained from local real estate boards, exchanges, or industry associations, aggregating relevant CRE data from such fragmented sources and then manually uploading them and conducting analysis would be substantially more time-consuming and inefficient than accessing that data via a readily available CRE information service. ***(Because CoStar's conduct requires any competing CRE information service to acquire data through such less efficient routes, CoStar's scheme raises rivals' costs.)***

220.  There are no reasonable substitutes for a CRE Information Service. Potential alternatives, such as CRE information published in newspapers or other physical media, or even searches across databases that are not specific to CRE, such as Google or Facebook, are neither functional nor economic substitutes.  Manual information services take more time, effort, and cost than CRE Information Services, which are nearly instantaneous and have a variable marginal cost close to zero.

221.  On information and belief, expert discovery will show that and CRE Information Services exhibit low cross-price elasticity of demand with respect to other methods of obtaining CRE information. Further, the demand for CRE Information Services is relatively inelastic. At

any given moment in time, there is a universe of individuals who are seeking to buy, sell, lease CRE. Changes in the price for CRE Information Services will not change the quantity of such services demanded by the market. The relative inelasticity of demand, combined with the lack of competition, enables CoStar to charge supracompetitive prices without fear of losing volume.

222.    There are high barriers to entry in the market for CRE Information Services, due in part to the substantial upfront capital investment required. In order to launch a CRE information services platform, one must potentially spend millions of dollars designing, developing, and testing the software platform and available analytical tools, as well as researching and obtaining public and private data sources. And then, once the platform is built, substantial time and resources must then be expended in marketing and recruiting users to the platform. CoStar has raised those barriers by locking a potential competitor's userbase into long term, exclusionary contracts that are difficult to cancel and prevent the competitor from obtaining a broker's listings, data, and participation on its platform. Additionally, and further described below, CRE information services are subject to substantial network effects, which makes the service unable to effectively compete unless the competing entity is able to rapidly build its user base and access the data that comes along with it

223.    Accordingly, these alternative services and modes of researching and analyzing property markets are not reasonable substitutes for CRE Information Services. If a hypothetical monopolist were to execute a small but significant and non-transitory increase in price ("SSNIP") for its CRE Information Service, such as increasing prices by five percent above a competitive level, current customers would not substitute away from this product in significant numbers. Accordingly, CRE Information Services are a relevant product market.

**B.    The Relevant Geographic Market is the United States**

224.    To the extent Plaintiff's claims require the definition of a relevant market, the

relevant geographic market is the United States and its territories.

225.    The geographic scope for the relevant markets underlying this complaint is the United States. CoStar markets and sells its services nationwide, it collects data and listings on a nationwide basis, offers that information on a nationwide basis, and is used by brokers and other real estate professionals across the United States.

226.    Notably, CoStar and its competitors offer only a single nationwide subscription and do not offer regional or local market options. While CoStar and other providers of these services historically competed in specific Metropolitan Statistical Areas ("MSAs") and required customers to purchase subscriptions for specific MSAs, CoStar (and CREXi, its chief competitor) now offer only a national subscription option.

227.     CoStar's listings are primarily within specific MSAs, but that is largely due to the nature of commercial real estate, as the substantial share of commercial property lies within large metropolitan areas of the United States. CoStar's services are available for MSAs across the country and are not limited to a specific one or subset of them. The FTC has previously recognized that competition in these services would need to be nationwide, noting that CoStar and LoopNet (prior to its acquisition by CoStar) were "the only two providers of CRE listings databases with nationwide coverage" and that while other providers offered local or regional listings, "none have achieved the critical mass of users and data" that CoStar and its then primary competitor did. For that reason, in its complaint challenging CoStar's acquisition of LoopNet, the FTC took the position that "the geographic scope of the relevant market is global, notwithstanding the more limited geographic scope of the services themselves."

228.    While it may be the case that a buyer or lessor of commercial real estate may be looking for a property in a particular MSA, the relevant market for purposes of this litigation is

not the market for commercial real estate, but the markets for listings of commercial real estate and for information about commercial real estate. And because CoStar and CREXi *only* offer nationwide subscriptions to their services, the geographic scope for *those* relevant markets is nationwide.

229. Accordingly, the relevant geographic scope of competition in these markets is national.

230. CoStar's anticompetitive behavior is aimed at generating and maintaining monopoly power in real estate markets throughout the United States. As discussed more below, CoStar's efforts to forestall competition depend on its ability to obtain customers, data, listings, and more nationwide, without limiting or focusing on specific regions or markets.

**C.    CoStar has Monopoly Power in the Relevant Markets**

231. At all relevant times, CoStar had—and continues to have—monopoly power in the markets for CRE Listing Services and CRE Information Services in the United States. Direct evidence of monopoly power includes the fact that CoStar had the power to maintain the price of CRE Listing Services and CRE Information Services at supracompetitive levels profitably without losing substantial sales to other products. Indirect evidence of monopoly power includes the fact that CoStar's market shares in each of the relevant markets exceeds 90%, and market circumstances—including substantial barriers to entry—slow or prevent rivals from competing.

**1.    Direct Evidence**

232. With no competitors constraining its price-setting behavior, CoStar increases the prices for its CRE Listing Services and CRE Information Services every year. Yet CoStar suffers no appreciable loss of sales volume as a result.

233. Shortly after Xceligent declared bankruptcy, CoStar raised its licensing fee by approximately 80%. Another customer noted that CoStar raised its prices 300 to 500% after

merging with LoopNet.

234.   CoStar sells CRE Listing Services and CRE Information Services substantially in excess of marginal costs, and in excess of competitive prices. The revenue CoStar derives from selling CRE Listing Services and CRE Information Services far outstrips the cost of acquiring the data that fuels that service, leaving the marginal variable cost of each query of the database close to zero.

235.   CoStar's ability to increase prices to supracompetitive levels without losing a meaningful volume of customers is direct evidence of its monopoly power in each of the two relevant markets.

### 2.   Indirect Evidence

236.   At all relevant times, CoStar has controlled almost the entire market for CRE Listing Services and CRE Information Services in the United States.

237.   CoStar's dominant market position, together with the substantial barriers to entry and expansion and described herein, prevents rivals from meaningfully increasing output, raises their costs, attracting brokers, or achieving sufficient scale to compete effectively in the short term. These barriers are both structural and the product of CoStar's exclusionary conduct, including its efforts to lock customers into restrictive contracts, impede interoperability, and prevent brokers from sharing their own information and content with competing services.

238.   CoStar also has represented that nearly 90% of all CRE activity occurs on a CoStar Network and that LoopNet generates "6x the traffic of [its] closest competitor" and receives approximately 85% of website visitors as compared to competitors. Industry analysts likewise report that LoopNet's traffic substantially exceeds that of any competing CRE listing platform.

239.   In a 2024 earnings call, CoStar CEO Florance claimed that "Over the past 12

months, LoopNet had a massive 72 times the unique visitors of the average competitor."

240.    The relevant product markets are characterized by substantial barriers to entry and expansion. The existence of these barriers renders the Internet CRE information services and listing markets particularly susceptible to concentration, exclusionary conduct, and the maintenance of monopoly power.

241.    The relevant markets are characterized by substantial network effects. In the markets for internet CRE listing and information services, the participation of brokers representing sellers or lessors increases the value of the platform to brokers representing buyers or lessees because a greater volume and diversity of listings makes the platform more useful. In turn, increased participation by brokers representing buyers or lessees enhances the value of the platform to brokers representing sellers or lessors by increasing visibility and transaction opportunities.

242.    These network effects create a self-reinforcing cycle that disadvantages new entrants and smaller competitors. A new entrant cannot effectively attract brokers representing sellers or lessors absent a sufficiently large base of brokers representing buyers or lessees already using the platform. Conversely, brokers representing buyers or lessees are unlikely to adopt a platform lacking sufficient listing inventory and participation by sellers or lessors. A potential customer is also unlikely to switch to a CRE information service with far less available data from a network with a more limited scope. This "chicken-and-egg" dynamic substantially impedes entry and expansion by rival firms and reinforces CoStar's market dominance.

243.    The Federal Trade Commission has recognized that "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry." Those same network effects continue to entrench CoStar's dominant position in the relevant

57

markets.

244.    CoStar has exploited these network effects to strengthen and preserve its monopoly power, including by imposing and reinforcing substantial switching costs on customers. Through a decades-long acquisition strategy involving numerous competitors and complementary platforms, CoStar consolidated users and data onto its proprietary ecosystem. Following CoStar's acquisition of LoopNet in 2012, its subsequent exclusionary campaign against Xceligent, and its aggressive litigation against attempted competitors such as CREXi, many brokers and other market participants who previously relied on lower-cost or competing services became dependent on CoStar's platforms and data products.

245.    CoStar's own customer-retention metrics demonstrate the existence and significance of this market power. CoStar regularly reports customer renewal rates approaching or exceeding 90 percent. Industry analysts have attributed these unusually high retention rates to the risks and costs customers face in attempting to switch to alternative providers. Analysts have further observed that CoStar maintains a "switching cost moat" and benefits from strong network effects that deter customers from using competing services.

246.    Additionally, CoStar's contracts often contain auto-renewal terms with lengthy notice periods to cancel that auto-renewal. Online forums are rife with complaints about CoStar's renewal practices, including one reviewer on TrustPilot noting that the invoice arrived right after the cancellation window closed. These auto-renewals with little to no way to cancel further lock users into CoStar's products and erects another barrier to switching to a competitor.

247.    Direct and circumstantial evidence confirms CoStar's monopoly power. In both the CRE information and listing services markets, CoStar's share is routinely estimated to be at least 90%, and its flagship platforms—the CoStar Platform and LoopNet—are widely regarded

58

by CRE professionals as essential industry tools.

248.    CREXi's counterclaims and online commentary contain anecdotes that CoStar's own customers recognize CoStar's monopoly power and its ability to charge higher prices for a worse service because there is no serious threat of competition:

- "No idea how loopnet / costar gets away with what they do as an extremely litigious attempt at a monopoly that feels more like extortion than a service every time you pay them."

- "CoStar is a monopoly and they behave in that manner. Everyone needs to stop giving them information on your listings when you sell them. They make all their money selling the info you give them back to everyone else."

- "It's honestly pretty ridiculous no website can really compete with LoopNet and they rip everyone off. CREXi is trying but they have a long way to go."

- "They've wronged me in so, so many different ways. They are monopolistic to the highest degree."

- "Too bad CoStar is nearly impossible to compete with...could really use some (accurate) competition in the CRE data space."

- "From the administrative/operations side, I absolutely hate this company. They are a monopoly, they know it, and they will shake every red cent out of your pocket that they can, just because they can."

- "Costar sucks and is expensive and you need it."

- "Ugh costar is the drug cartel of real estate. . . . It's complete bullshit and there is nothing you can do about it other than pay up or don't do business. Because they have bought everyone that is close to a competitor you have no other options.'"

## VII.    INTERSTATE COMMERCE

249.    The market for CRE Listing Services and CRE Information Services in the United States is a national market.

59

250.    Defendants have marketed CRE Listing Services and CRE Information Services to Purchasers in all U.S. states and territories.

251.    Defendants have sold CRE Listing Services and CRE Information Services to Purchasers in all U.S. states and territories.

252.    Defendants' business in CRE Listing Services and CRE Information Services involves a continuous and uninterrupted flow of commerce across state lines.

253.    Defendants' anticompetitive actions have had a substantial effect on interstate trade and commerce in the market for CRE Listing Services and CRE Information Services.

## VIII.  CLASS ACTION ALLEGATIONS

254.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons or entities in the United States and its territories that directly purchased CRE Listing Services or CRE Information Services from Defendants at any time during the period of April 14, 2022, until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period").

255.    The class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all federal governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case; (g) all jurors assigned to this case; and (h) any immediate family members of the individuals listed above.

256.    Plaintiff reserves the right to modify or amend the definition of the class before the Court determines whether certification is appropriate.

257.    Numerosity, Fed. R. Civ. P. 23(a)(1): Plaintiff does not know the exact number of Class members because such information presently is solely in Defendants' control. But based on the nature of the trade and commerce involved, the Class is so numerous and geographically dispersed across the United States and its territories that joinder of all members is impracticable. According to statements by CoStar CEO Florance, there are at least tens of thousands of members in the Class.

258.    Common Questions Predominate, Fed. R. Civ. P. 23(a)(2) and (b)(3): Numerous questions of law and fact are common to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

a.  whether CoStar possesses monopoly power in the relevant markets for CRE Information Services and CRE Listing Services;

b.  whether CoStar willfully acquired or maintained that power through anticompetitive conduct, including exclusive dealing, watermarking, and technological barriers;

c.  whether CoStar has substantially foreclosed competitors from the Relevant Markets by denying them a critical mass of inputs necessary to sustain a viable competing product;

d.  whether CoStar's conduct has the effect of suppressing or eliminating competition in the Relevant Markets;

e.  whether CoStar's conduct resulted in supracompetitive pricing, or reduced output, innovation, or quality;

f.  whether such actions constituted violations of the Sherman Antitrust Act;

g.  the nature and scope of injunctive relief necessary to restore competition; and

h.  the measure of damages suffered by the Class.

259.    These and other questions of law or fact that are common to the members of the

Class predominate over any questions affecting only individual members of the Class. Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

260.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff's claim arises from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

261.    Plaintiff and the other Class members were injured by the same unlawful conduct, which resulted in their paying more for CRE information and/or listing services than they would have in a competitive market.

262.    Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff purchased CRE information and/or listing services directly from Defendants within the United States during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is adverse to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiff intends to prosecute this action vigorously.

263.    Common Grounds for Injunctive Relief, Fed. R. Civ. P. 23(b)(2): Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

264.    Superiority, Fed. R. Civ. P. 23(b)(3): Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will

permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

265.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

266.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## COUNT ONE
### Monopolization (Course of Conduct) in Violation of Sherman Act § 2

267.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

268.    To the extent it is necessary to define the relevant markets, the relevant product

markets are the markets for CRE Listing Services and CRE Information Services, and the relevant geographic market is the United States and its territories.

269. At all relevant times, CoStar possessed monopoly power in the relevant markets. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

270. As more fully alleged above, CoStar has willfully engaged in conduct that has monopolized the CRE Listing Services and CRE Information Services markets. Each of CoStar's actions, when viewed collectively, increased, maintained, or protected its monopoly in the markets for CRE Listing Services and CRE Information Services. CoStar's conduct had the anticompetitive effect of allowing CoStar to unlawfully maintain and enhance its monopoly power in the CRE Listing Services and CRE Information Services markets and prevent its rivals from competing.

271. Through its anticompetitive Scheme, CoStar has substantially foreclosed competition in the markets for CRE Listing Services and CRE Information Services, namely by foreclosing rivals from access to a volume of inputs sufficient to create a competitive product. CoStar's anticompetitive acts have had harmful effects on competition and consumers.

272. CoStar's anticompetitive conduct includes, but is not limited to, the entry of exclusive agreements with customers, and enforcing that exclusivity by contaminating the data and erecting technological impediments.

273. CoStar has maintained its monopoly power in the CRE Listing Services and CRE Information Services market through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

274. CoStar's anticompetitive acts have had harmful effects on competition and

consumers. The direct, foreseeable, and proximate result of CoStar's anticompetitive conduct has been to increase prices, reduce output, reduce choice, and otherwise harm competition in the CRE Listing Services and CRE Information Services markets. CoStar's anticompetitive Scheme has enabled CoStar to impose supracompetitive prices for CRE Listing Services and CRE Information Services.

275.    CoStar's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

276.    To the extent CoStar offers any non-pretextual procompetitive justification for its conduct, CoStar could have achieved any such benefit through less restrictive means.

277.    As a direct, material, and proximate result of CoStar's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's monopolization of the CRE Listing Services and CRE Information Services markets.

278.    Plaintiff and the Class seek treble damages for CoStar's violations of § 2 under § 4 of the Clayton Act.

279.    Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO
### Monopolization (Exclusive Dealing) in Violation of Sherman Act § 2

280.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

281.    To the extent it is necessary to define the relevant markets, the relevant product

markets are the markets for CRE Listing Services and CRE Information Services, and the relevant geographic market is the United States and its territories.

282.    At all relevant times, CoStar possessed monopoly power in the relevant markets. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant markets.

283.    As more fully alleged above, CoStar has willfully engaged in exclusionary conduct by entering into exclusive agreements with customers. This conduct has had the anticompetitive effect of allowing CoStar to unlawfully maintain and enhance its monopoly power in the CRE Listing Services and CRE Information Services markets and prevent its rivals from competing.

284.    Through its anticompetitive Scheme, CoStar has substantially foreclosed competition in the markets for CRE Listing Services and CRE Information Services, namely by foreclosing rivals from access to a volume of inputs sufficient to create a competitive product.

285.    CoStar's contracts are of sufficient duration to prevent meaningful competition by rivals. Among other things, CoStar's agreements auto-renew for a one-year term without sufficient notice to customers, and CoStar obstructs and fails to respect customer attempts to cancel subscriptions.

286.    CoStar has maintained its monopoly power in the CRE Listing Services and CRE Information Services markets through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

287.    CoStar's anticompetitive acts have had harmful effects on competition and consumers. The direct, foreseeable, and proximate result of CoStar's anticompetitive conduct has been to increase prices, reduce output, and harm competition in the CRE Listing Services and

CRE Information Services market. CoStar's anticompetitive Scheme has enabled CoStar to impose supracompetitive prices for CRE Listing Services and CRE Information Services.

288.    CoStar's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

289.    To the extent CoStar offers any non-pretextual procompetitive justification for its conduct, CoStar could have achieved any such benefit through less restrictive means.

290.    As a direct, material, and proximate result of CoStar's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's monopolization of the CRE Listing Services and CRE Information Services market.

291.    Plaintiff and the Class seek treble damages for CoStar's violations of § 2 under § 4 of the Clayton Act.

292.    Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT THREE
### Exclusive Dealing in Violation of Sherman Act § 1

293.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

294.    To the extent it is necessary to define the relevant markets, the relevant product markets are the markets for CRE Listing Services and CRE Information Services, and the relevant geographic market is the United States and its territories.

295.    At all relevant times, CoStar possessed market power in the relevant markets.

CoStar possessed the power to raise prices and/or restrict output in the relevant market.

296.    CoStar and certain unnamed co-conspirators have engaged in an unlawful contract, combination, or conspiracy to charge supracompetitive prices for CRE Listing Services and CRE Information Services, which unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

297.    Through the exclusivity agreements described herein, CoStar conspired with the counterparties to those agreements to unlawfully maintain CoStar's monopoly power in the relevant markets by agreeing to provide CRE information exclusively to CoStar and not to CoStar's competitors.

298.    Through its anticompetitive Scheme, CoStar and its co-conspirators substantially foreclosed competition in the markets for CRE Listing Services and CRE Information Services, namely by foreclosing rivals from access to a volume of inputs sufficient to create a competitive product.

299.    CoStar's agreements are of sufficient duration to prevent meaningful competition by rivals. Among other things, CoStar's agreements auto-renew for a one-year term without sufficient notice to customers, and CoStar obstructs and fails to respect customer attempts to cancel subscriptions.

300.    The direct, foreseeable, and proximate result of CoStar and its Data Contributors' agreement(s) has been to increase prices and harm competition in the CRE Listing Services and CRE Information Services market. CoStar and its Data Contributors' agreements have enabled CoStar to impose supracompetitive prices for CRE Listing Services and CRE Information Services.

301.    CoStar's exclusionary conduct lacks a procompetitive justification that offsets the

68

harm caused by its anticompetitive and unlawful conduct.

302.    To the extent any such procompetitive justification exists, CoStar and its co-conspirators could have achieved it through less restrictive means.

303.    As a direct, material, and proximate result of CoStar's violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's monopolization of the CRE Listing Services and CRE Information Services markets.

304.    Plaintiff and the Class seek treble damages for CoStar's violations of § 1 under § 4 of the Clayton Act.

305.    Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully request:

A.    That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

B.    That the Court appoint Plaintiff as the representative of the Class;

C.    That the Court appoint Plaintiff's counsel as counsel for the Class;

D.    That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from CoStar's violations of the Sherman Act;

E.    That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing CoStar from continuing its unlawful acts in violation of the Sherman Act;

F.    That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorneys' fees in bringing this action;

G.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

H.    Such other and further relief as this Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

306.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

DATED: May 20, 2026

Respectfully submitted,

*/s/ Evelyn Y. Riley*
Evelyn Y. Riley
**CUNEO GILBERT FLANNERY
& LADUCA, LLP**
2445 M Street NW, Suite 740
Washington, D.C. 20037
Tel: (202) 789-3960
evelyn@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT FLANNERY
& LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Alexandra Klein*
**CUNEO GILBERT FLANNERY
& LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Tel: (202) 789-3960
aklein@cuneolaw.com

Bruce E. Gerstein*
Deborah A. Elman*
David Rochelson*
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street, 28th Floor
New York, NY 10005
Tel: (212) 398-0055
bgerstein@garwingerstein.com
delman@garwingerstein.com
drochelson@garwingerstein.com

Heidi M. Silton*
Jessica N. Servais*
Joseph C. Bourne*
Bryan L. Plaster*
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
blplaster@locklaw.com

*Counsel for Plaintiff and the Proposed Class*

*\* pro hac vice forthcoming*

71